# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 06 2019, 7:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mary Jane Lapointe
Daniel Lapointe Kent
Lapointe Law Firm, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Barry B. Sutton
Clark Hill PLC
Birmingham, Michigan

Crystal G. Rowe
Kightlinger & Gray, LLP
New Albany, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Christopher B. Elliott,

*Appellant-Plaintiff,*

v.

First String Products LLC, First String USA, and Firststring LLC,

*Appellees-Defendants.*

September 6, 2019

Court of Appeals Case No. 18A-PL-1450

Appeal from the Johnson Superior Court

The Honorable Marla Clark, Judge

Trial Court Cause No. 41D04-1512-PL-126

**Friedlander, Senior Judge.**

## Statement of the Case

Christopher B. Elliott appeals the trial court's grant of summary judgment to First String Products LLC, First String USA, and Firststring LLC (collectively, "First String"). We affirm.

## Issues

Elliott raises two issues, which we restate as:

1. Whether the trial court erred by excluding in part the testimony of one of Elliott's expert witnesses.

2. Whether the trial court erred in granting First String's motion for summary judgment.[1]

## Facts and Procedural History

Elliott purchased a compound bow from a friend several months before the incident at issue. He did not receive any manuals or written instructions. Elliott used the bow for target shooting several days a week for several months after the purchase, without incident.

On September 13, 2015, Elliott took his bow to J. Roberts Marketing, LLC d/b/a Honey Creek Tackle ("Honey Creek"), a store that sells and installs strings for hunting bows. Honey Creek replaced the existing bowstring with a

---

[1] First String has filed a motion for oral argument. We deny the motion by separate order.

string that had been manufactured by First String. The packaging for the bowstring included only one advisement: "Professional installation of the product is highly recommended." Appellant's App. Vol. II, p. 122. About a week after Honey Creek installed the new bowstring, Elliott suffered a severe eye injury when the bowstring broke while he was target shooting.

[5] On December 16, 2015, Elliott sued First String, alleging the bowstring was defectively designed or manufactured, and Honey Creek, alleging negligent installation of the bowstring. He requested a jury trial. First String and Honey Creek separately filed answers denying liability.

[6] During the discovery process, the parties disclosed the identities of their expert witnesses. On October 18, 2016, Elliott moved for an enlargement of time to identify an additional expert witness. First String and Honey Creek objected to the motion, and the trial court denied it.

[7] On November 10, 2016, First String filed a motion to exclude testimony by one of Elliott's designated experts, John Carlson, and a motion for summary judgment. Honey Creek joined in First String's motions. Elliott filed responses in opposition to the motions. First String filed replies in support of its motions.

[8] On February 1, 2017, the trial court granted in part and denied in part First String's motion to exclude Carlson's testimony. The court determined:

> Carlson is an award-winning archer and has spent many, many years shooting bows and repairing bows. He was a member of a trade association through which he received training and information, and he owned a business repairing bows. He is

qualified as a skilled witness regarding the use of and operation of cross and compound bows. He is also qualified to inspect the bow and strings in question and testify about his observations. This knowledge will assist the jury to understand the evidence. As to these matters, the Motion is DENIED.

However, his testimony about whether the string was defective and why the string in question broke is too speculative and the risk of jury confusion is substantially outweighed by the probative value of the evidence. He testified that he had no knowledge of FirstString's [sic] manufacturing process, and that he did no testing or measurements, but relied only on his own visual examination and a brief conversation with the Plaintiff. As to his opinion that the string had been cut in the manufacturing process, he admitted that there was no physical evidence to support his opinion and that it was "an assumption on [his] part." He also agreed that his opinion was "a pure guess." This evidence is inadmissible.

*Id.* at 16.[2]

[9] Next, the court held a hearing on First String's motion for summary judgment. On May 22, 2017, the court granted First String's motion, determining it was entitled to summary judgment on Elliott's claims that the bowstring was defectively designed or manufactured.

---

[2] The trial court also rejected as "too speculative" Carlson's testimony about whether Honey Creek acted negligently in the course of restringing the bow. Appellant's App. Vol. II, p. 16. That portion of the ruling is not at issue in this appeal.

Elliott filed a motion to certify the summary judgment ruling for interlocutory appeal. The trial court granted the motion, but this Court denied Elliott's request to accept jurisdiction over the appeal. *Elliott v. J. Roberts Mktg.*, No. 41A05-1706-PL-1391 (Ind. Ct. App. July 28, 2017).

On June 14, 2018, Elliott and Honey Creek jointly moved to dismiss Elliott's claims against Honey Creek. The trial court granted the motion and entered a final judgment. This appeal followed.

# Discussion and Decision

## 1. Expert Witness Testimony

Elliott argues the trial court erred in barring his expert witness from testifying about whether the bowstring was defectively manufactured and why it broke. He claims that Carlson's testimony on those subjects was reliable and based on valid principles. First String responds that Carlson's testimony about the cause of the accident is too speculative to be admitted as evidence.

We review a trial court's decision to admit or exclude evidence, including expert witness testimony, for an abuse of discretion. *Wilkerson v. Carr*, 65 N.E.3d 596 (Ind. Ct. App. 2015). A trial court abuses its discretion when its decision "is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* at 599-600. We presume the trial court's evidentiary decision is correct, and the party challenging that decision bears the burden of

demonstrating an abuse of discretion. *5200 Keystone Ltd. Realty, Inc. v. Filmcraft Labs., Inc.*, 30 N.E.3d 5 (Ind. Ct. App. 2015).

[14] In general, relevant evidence is admissible, and "[i]rrelevant evidence is not admissible." Ind. Evid. Rule 402. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Ind. Evid. Rule 401. Indiana Evidence Rule 702 governs the admission of expert witness testimony, and it provides as follows:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

The trial court is considered the gatekeeper for the admissibility of expert opinion evidence under Rule 702. *Bennett v. Richmond*, 960 N.E.2d 782 (Ind. 2012).

[15] In *Howerton v. Red Ribbon, Inc.*, 715 N.E.2d 963 (Ind. Ct. App. 1999), *trans. denied*, Howerton became injured as he climbed out of a hotel bathtub. He had grabbed a wall-mounted bar to help pull himself up, but the bar pulled away from the wall as he rose, causing him to fall.

[16]     Howerton sued the bar's manufacturer, among other defendants, claiming negligent design and manufacture. He intended to present expert testimony from an engineer about the bar. The manufacturer moved to exclude the engineer's testimony. The trial court granted the motion in part, determining the engineer could not express an opinion as to whether the bar was defectively manufactured or designed. The court allowed the engineer to testify about what he observed while inspecting the bar.

[17]     On appeal, Howerton argued the trial court erred in excluding in part his expert witness's testimony. A panel of this Court noted that, among other shortcomings, the engineer: (1) had not tested the bar; (2) did not test any exemplars; (3) had no knowledge about how the unit was manufactured or installed; (4) did not know whether there were any prior incidents involving the bar; and (5) had not performed any research on grab bars or similar units. The Court determined the expert witness's failure to consider these factors meant his opinion was more likely to be "subjective belief or unsupported speculation." *Id.* at 967. The Court affirmed the trial court's decision to exclude the engineer's testimony as to whether the bar was defectively designed or manufactured.

[18]     In the current case, Carlson's opinions about the cause of the accident and whether the bowstring was defectively manufactured have shortcomings similar to the engineer's testimony in *Howerton*. Carlson conceded he was not an engineer or accident reconstruction expert. He had never before been asked to determine how an archery accident had occurred. Carlson did not subject the

bow or the bowstring to any tests beyond a visual examination. In addition, he had no knowledge about First String's design or manufacturing processes. Finally, Carlson conceded that he did not know how the bowstring broke.

Elliott argues that Carlson's opinion testimony is admissible because Carlson's investigation (which consisted of examining the bow and bowstring and talking with Elliott) led him to rule out user error in storing, carrying, and firing the bow, and as a result he concluded the accident must have been caused by a defect in the bowstring. We disagree. Speculation will not pass for an expert opinion under Rule 702. *Clark v. Sporre*, 777 N.E.2d 1166 (Ind. Ct. App. 2002). Carlson testified that his conclusion that the bowstring had been damaged during the manufacturing process was "an assumption on my part." Appellant's App. Vol. II, p. 152. We conclude the trial court did not abuse its discretion in barring Carlson from testifying about what caused the bowstring to break and whether the bowstring was defectively manufactured.

## 2. Summary Judgment

Elliott next argues the trial court should not have granted First String's motion for summary judgment on his claim for products liability, claiming there are disputes of fact about the circumstances and cause of the accident. First String responds that its expert witness testimony established that it is entitled to summary judgment, and Elliott's evidence fails to demonstrate disputes of material fact.

[21] Orders for summary judgment are reviewed de novo, and we apply the same standard of review as the trial court. *AM Gen. LLC v. Armour*, 46 N.E.3d 436 (Ind. 2015). Summary judgment shall be granted "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The summary judgment process has two steps: the moving party must first make the showing required by Rule 56. *AM Gen.*, 46 N.E.3d 436. "Upon this showing, the nonmoving party then has the burden to demonstrate that there is a genuine issue of material fact." *Id*. at 439.

[22] The Court accepts as true those facts alleged by the nonmoving party, construes the evidence in favor of the nonmovant, and resolves all doubts against the moving party. *Breining v. Harkness*, 872 N.E.2d 155 (Ind. Ct. App. 2007), *trans. denied*. A trial court's order on summary judgment is cloaked with a presumption of validity, and the party appealing from a grant of summary judgment must bear the burden of persuading this Court that the decision was erroneous. *Id.* We may affirm the grant of summary judgment upon any basis argued by the parties and supported by the record. *Id.*

[23] Indiana Code section 34-20-1-1 (1998) et seq., also known as the Indiana Products Liability Act ("IPLA"), governs product liability claims in Indiana. A consumer may file a claim for injuries caused by a defective product, as follows:

> a person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's

property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

(1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;

(2) the seller is engaged in the business of selling the product; and

(3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

Ind. Code § 34-20-2-1 (1998).

In addition:

The rule stated in [Ind. Code § 34-20-2-1] applies even if:

(1) the seller has exercised all reasonable care in the manufacture and preparation of the product; and

(2) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

However, in an action based on an alleged design defect in the product or based on an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in designing the product or in providing the warnings or instructions.

Ind. Code § 34-20-2-2 (1998).

The General Assembly defines a defective product as follows:

> A product is in a defective condition under this article if, at the time it is conveyed by the seller to another party, it is in a condition:
>
> (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and
>
> (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

Ind. Code § 34-20-4-1 (1998).

A product can be defective within the meaning of the statute because of a manufacturing defect, a defective design, or a failure to warn of dangers while using the product. *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953 (Ind. 2018). The General Assembly has defined a failure to provide adequate warnings or instructions as follows:

> A product is defective under this article if the seller fails to:
>
> (1) properly package or label the product to give reasonable warnings of danger about the product; or
>
> (2) give reasonably complete instructions on proper use of the product;

> when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

Ind. Code § 34-20-4-2 (1998). The duty to warn has two parts: (1) providing adequate instructions for safe use and (2) providing a warning as to dangers inherent in improper use. *Ford Motor Co. v. Rushford*, 868 N.E.2d 806 (Ind. 2007). Whether a duty to warn exists is a question of law for the court, and whether warnings were adequate, "which implicates breach of duty, is generally a question for the trier of fact to resolve." *Id.* at 810.

[27] Elliott claims that all three types of defect – defective design, defective manufacture, and failure to warn – are at issue here. All three claims are based on his argument that he did not damage the bowstring by dry firing the bow or by other means and as a result the accident and resulting injury must have been caused by the bowstring's defects. The parties' dispute hinges upon the question of causation. "Proximate cause is also an essential element not only of a claim of strict liability, but also a claim sounding in negligence." *U-Haul Int'l., Inc. v. Nulls Mach. & Mfg. Shop*, 736 N.E.2d 271, 281 (Ind. Ct. App. 2000), *trans. denied*. When the issue of causation is within the understanding of a lay person, testimony of an expert witness is not necessary. *Smith v. Beaty*, 639 N.E.2d 1029, 1034 (Ind. Ct. App. 1994). By contrast, if the issue of causation is beyond the understanding of a lay person, and the party moving for summary judgment designates expert evidence negating that element, the burden shifts to the defendant to present evidence to sustain the action. *See U-Haul*, 736 N.E.2d 271

(plaintiff failed to designate expert evidence to refute expert opinion that a defective brake valve did not cause an accident).

[28] In the current case, First String cited evidence from Scott Parrish, First String's president, in its motion for summary judgment. Parrish explained that he has designed and made bowstrings since the 1980s. He further described information about the materials that comprised the bowstring at issue and explained that the bowstring should have been able to "hold over 1000 pounds of tension, roughly 15 times what [it would see] during ordinary use." Appellant's App. Vol. II, p. 45.

[29] Parrish also described the process by which First String manufactures bowstrings. The process involves wrapping raw fiber materials around mandrels, or posts, twisting them together, and applying the "serving," which is an additional string material that is wrapped around the base string material. Appellees' App. Vol. 2, p. 89. First String inspects the raw fiber materials before use and follows a quality control process during manufacturing to detect defects. During the manufacturing process, bowstrings are "stressed to over 400 pounds of tension" to check for durability. Appellant's App. Vol. II, p. 46.

[30] In addition, Parrish had inspected Elliott's bow and the broken bowstring, and based on his observations and experience, he concluded the bowstring had been damaged by a user during a "dry fire event" before the incident that resulted in Elliott's injury. *Id.* at 46.

[31]     First String also presented testimony from engineer George Saunders, who inspected the bowstring and bow using a portable digital microscope, a camera, and measuring instruments. In addition, Saunders reviewed the documents that had been previously filed in the case. Based upon his examination and his professional knowledge, he concluded the bowstring had been damaged due to a dry fire event prior to Elliott's injury. Saunders noted: (1) the bow's cams were warped where the bowstring touched them, and (2) upon microscopic examination, the broken areas of the bowstring showed signs of melting and "re-solicitation" from a "high speed, high energy short duration event" rather than cutting. *Id.* at 52.

[32]     Finally, First String presented an affidavit from Lorne Smith, a hunter safety instructor and hunting accident investigator. Smith examined the bow and bowstring, and various documents that had been filed in this case. He concluded, "[t]he bow string exhibited signs of separation under load conditions consistent with the dry fire event." *Id.* at 57. Smith further explained the damaged string was consistent with "what is seen in a dry fire and reported throughout the industry." *Id.* Smith further explained that the bow showed signs of an "overdraw event," which can cause a dry fire event. *Id.* at 59.

[33]     We conclude from the foregoing that whether a bowstring break and a resulting injury were caused by a defective product (through defective design, manufacture, or failure to warn) versus a dry fire event requires specialized knowledge and is beyond the understanding of a lay person. First String presented expert evidence from Parrish, Saunders, and Smith to establish that

the incident was caused by a user's dry fire event rather than defects in design or manufacture, or failure to warn. Elliott was obligated to provide expert evidence in return, but the trial court barred Carlson from testifying about what caused the bowstring to break. As a result, Elliott did not put forth any admissible expert witness evidence to establish a dispute of material fact as to causation. The trial court did not err in granting summary judgment to First String as to Elliott's product liability claims.

# Conclusion

[34] For the reasons stated above, we affirm the judgment of the trial court.

[35] Judgment affirmed.

Riley, J., and Mathias, J., concur.